## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PUBLIC EMPLOYEES FOR<br>ENVIRONMENTAL RESPONSIBILITY<br>962 Wayne Ave., Suite 610<br>Silver Spring, MD 20910<br><br>and<br><br>HAWAII ISLAND COALITION<br>MALAMA PONO<br>PO BOX 6002<br>Kurtistown, Hawaii 96760<br><br>*Plaintiffs,*<br><br>v.<br><br>FEDERAL AVIATION ADMINISTRATION<br>800 Independence Ave., S.W.<br>Washington, D.C.  20591<br><br>*Defendant,* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 17-2045<br><br><br><br><br><br>**COMPLAINT** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.    Plaintiffs bring this action for injunctive and declaratory relief to require the

Defendant, the Federal Aviation Administration ("FAA"), to develop an Air Tour Management

Plan ("ATMP") or voluntary agreements as directed by statute for Hawaii Volcanoes National

Park, Haleakalā National Park, Lake Mead National Recreation Area, Muir Woods National

Monument, Glacier National Park, Great Smoky Mountains National Park, and Bryce Canyon

National Park (hereinafter "parks impaired by overflights" ("PIO") within two years.  Plaintiffs

also seek an injunction of any further air tour operations over the PIOs where ATMPs or

voluntary agreements are not in place 24 months after the Court's order, and an award of Plaintiffs' reasonable costs and expenses of this litigation, including attorneys' fees.

2.      Plaintiffs include a public interest organization dedicated to reducing the impact of noise from helicopters on the State of Hawaii; and a public interest organization whose mission is to advocate for public employees, including those who are employed at a PIO, and whose members regularly use PIOs but find that the overflights disrupt their enjoyment of the parks.

3.      Plaintiffs claim that the FAA's failure to develop ATMPs or to enter voluntary agreements for the PIOs violates the Administrative Procedure Act of 1946, as amended, ("APA"), 5 U.S.C. § 701, *et seq.*; and the National Park Air Tour Management Act of 2000, as amended, ("NPATMA"), 49 U.S.C. § 40128.

4.      Plaintiffs further claim that Defendant is in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*, in failing to prepare an environmental impact statement ("EIS") or other environmental documents required by NEPA before repeated grants of interim authority for air tour operators in the PIOs without ever developing an ATMP or entering voluntary agreements pursuant to the NPATMA.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and the Declaratory Judgment Act, 28 U.S.C. § 2201.

6.      This Court has the authority to award costs, expenses and attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

7.      Venue is properly vested in this court under 28 U.S.C. § 1391(e) because the

Defendant resides in this district, one Plaintiff is incorporated in this district, and because a

substantial part of the acts and omissions giving rise to this claim occurred in this district.

8.      The United States has waived sovereign immunity with respect to the claims

raised herein under 5 U.S.C. § 702.

## PARTIES AND STANDING

9.      Plaintiff Public Employees for Environmental Responsibility ("PEER") is a

nonprofit organization incorporated in the District of Columbia and headquartered in Silver

Spring, MD.  It is a national alliance of local, state and federal resource professionals.  PEER's

articles of incorporation declare its mission to include educating the public and speaking out, as

well as defending those who speak out, about environmental ethics and compliance with

environmental laws.  PEER works nationwide with government scientists, land managers,

environmental law enforcement agents, field specialists, and other resource professionals

committed to responsible management of America's public resources, including national parks

and other public lands.  PEER members include individuals who hike or bird-watch in the PIOs,

and whose enjoyment of these parks is diminished by the presence of overflights that are

unregulated by any ATMP or voluntary agreement.

10.      PEER members include individuals who recreate, study wildlife and soundscapes,

or operate businesses in the PIOs, and whose enjoyment of these parks, whose vocations and

enterprises are diminished by excessive overflights that are unregulated in frequency, route, or

timing by an ATMP or voluntary agreement. All of these members complain of noise and

disruption from excessive overflights, including:

(a) A recorder of soundscapes in Haleakalā National Park whose work product, which includes assisting national parks with soundscape studies and identifying wildlife species, has been interrupted by over 4,500 annual overflights which mask the natural ambience and negatively affect the behavior of wildlife, thus making soundscape recording and wildlife identification significantly more difficult to obtain;

(b) A retired ecologist who now leads tours and birding expeditions through the Lake Mead National Recreation Area, as well as camps and hikes in the area himself—who has found that the aircraft diminish the natural quiet he enjoys, reduce the quality of his tours, and make it harder to listen for birds;

(c) A tour company operator and an environmental educator in Muir Woods National Monument who have experienced disturbances, every few minutes, from over 1,000 annual overflights.  The tour operator's business is negatively affected by diminishing customer experience when customers are forced to cover their ears constantly. The environmental educator, who lives near the National Monument, experiences decreased quiet enjoyment of her own property by having to keep all windows closed to maintain concentration.

(d) In Glacier National Park, a nearby resident's weekly all day hikes have been ruined by the constant noise of over 750 annual overflights.  These overflights are also heard from his property from 7 a.m. to 7 p.m.  PEER members also include three former public employees at Glacier National Park – a former backcountry ranger and wildlife biologist, a former backcountry ranger and water systems operator, and a former state and national park management employee – whose professional experiences with nature in Glacier National Park have been altered by the overflights.

(e) In Great Smoky Mountains National Park, the owner of a tour guide company whose work and personal life have been disrupted by over 800 annual overflights which interrupt silent walks and destroy a key purpose of the guided tours - positive experiences with nature - by causing employees and customers to want to duck every fifteen minutes from the constant buzzing overhead; and

(f) A former Bryce Canyon National Park employee whose photographs have been ruined by the high altitude airplane contrails of over 450 annual overflights entering his landscape photography and who has also been deprived of the subtle natural sounds of wildlife, ultimately displacing his hiking locations;

11.     Plaintiff Hawaii Island Coalition Malama Pono ("HICoP") is an advocacy nonprofit coalition of homeowners whose houses are impacted by air tours headed towards Hawaii Volcanoes National Park.  Their homes lie in the path between Hawaii Volcanoes National Park and the airfields from which the helicopters conduct air tours.  As a result this group of over three hundred homeowners have suffered the adverse consequences of frequent and unregulated air tours.  In some cases, as many as 80 flights a day roar over their homes. They have suffered the near-constant noise from the helicopters, and have had their skies marred by the unattractive metal monsters. Contacts in the group have additionally suffered medical, economic, and social consequences.  Residents have had trouble sleeping and are afflicted by stress, anxiety, and high blood pressure.  Home prices have declined, and the noise from the helicopters has negatively impacted their ability to generate rental income.  Furthermore, the noise has caused distress in their pets, which could cause additional veterinary bills.  As a further impact of the air tours, homeowners in HICoP have found fewer occasions to entertain guests and feel their privacy has been impinged upon by the presence of airborne tourists over their

5

homes.  If the FAA were to develop an ATMP, it would probably reduce the number of air

flights, or reroute some of them over unpopulated areas.  Both actions would significantly

mitigate the adverse consequences suffered by HICoP.

12.      Defendant FAA is an administration of the Department of Transportation. 49

U.S.C. § 106.  Among other mandates, the Administrator of the FAA must "develop plans and

policy for the use of the navigable airspace and assign by regulation or order the use of the

airspace necessary to ensure the safety of aircraft and the efficient use of airspace." 49 U.S.C. §

40103(b)(1).  Congress has assigned responsibility for managing commercial air tours over

national park lands to the FAA.  *See* 49 U.S.C. § 40128.

## FACTS

13.      NPATMA was passed 17 years ago in the year 2000.  The Act mandated that

there would be no commercial air tours over national parks or within one half mile of a national

park (defined to include any unit of the National Park System), unless the air tour was authorized

by this statute.  49 U.S.C. §§ 40128(a)(1); 40121(g)(4)(a); 40128(g)(5).

14.      In order to conduct commercial air tour operations, an operator must apply to the

FAA for operating authority.  49 U.S.C. §§ 40128(a)(2)(A).  NPATMA directs that the

Administrator of the FAA, i*n cooperation with the Director of the National Park Service, "shall

establish an air tour management plan for any national park or tribal land for which such a plan is

not in effect whenever a person applies for authority to conduct a commercial air tour operation

over the park."  49 U.S.C. §§ 40128(b)(1)(A).  FAA is required to develop and implement an

ATMP before granting operating authority.  49 U.S.C. §§ 40128(a)(2)(D).  FAA is to "make

every effort" to act on applications for operating authority not later than 24 months after the

application is received.  49 U.S.C. §§ 40128(a)(2)(E).  Since an ATMP is required to grant

operating authority, this means that an ATMP must be developed within 24 months of any air tour operator application.

15.     All of the PIOs had existing air tour operators at the time NPATMA was enacted in 2000, which were then required by NPTMA to apply for operating authority, thus triggering the requirement for an ATMP within 24 months. However, no ATMPs have ever been established in those parks or any others.

16.     NPATMA was amended in 2012.  FAA Modernization Reform Act of 2012, Pub. L. No. 112-95, 126 Stat. 11. The amendments contained two exceptions to the previous requirement that all park units with tour operators have ATMPs.  The first is that a national park unit, if it has few enough flights (no more than 50 per year), could be exempted from NPATMA's requirements. 49 U.S.C. § 40128(a)(5)(A).  The FAA is required to promulgate an annual list of exempt parks. 49 U.S.C. § 40128(a)(5)(C)(i).  In 2015, based on the latest available list, 54 units of the national park system were exempt.  81 Fed. Reg. 75,183 (Oct. 28, 2016).  For those park units, the FAA is not required to develop an ATMP.

17.     The only years for which data on air tour numbers exists are 2013, 2014, 2015, and 2016, because the number of flights over a park only became relevant when the exemption for parks with fewer than 50 flights went into effect.  In 2013, there were more than 50 flights per year at all of the PIOs. NATIONAL PARK SERVICE, REPORTING INFORMATION FOR COMMERCIAL AIR TOUR OPERATIONS OVER NATIONAL PARK UNITS: 2013 ANNUAL REPORT (2016). In 2014, there were more than 50 flights per year at all of the PIOs. NATIONAL PARK SERVICE, REPORTING INFORMATION FOR COMMERCIAL AIR TOUR OPERATIONS OVER NATIONAL PARK UNITS: 2014 ANNUAL REPORT (2015).  In 2015, there were more than 50 flights per year at all of the PIOs, including 14,645 commercial air tours conducted over Hawaii Volcanoes

National Park.  NATIONAL PARK SERVICE, REPORTING INFORMATION FOR COMMERCIAL AIR

TOUR OPERATIONS OVER NATIONAL PARK UNITS: 2015 ANNUAL REPORT (2017).  In 2016, there

were more than 50 flights per year at all of the PIOs.  NATIONAL PARK SERVICE, REPORTING

INFORMATION FOR COMMERCIAL AIR TOUR OPERATIONS OVER NATIONAL PARK UNITS: 2016

ANNUAL REPORT (2017).  The number of air tours conducted over Hawaii Volcanoes National

Park increased to 15,489.  *Id.*

18.     Given that the PIOs exceeded that cap in 2013, 2014, 2015, and 2016, it is very

likely that flight numbers have remained above 50 in 2017.

19.     The second exception to the requirement for ATMPs in the 2012 amendments  is

an alternative to ATMPs whereby the Administrator of the FAA and the Director on the National

Park System may enter into voluntary agreements with all operators over the park as described at

49 U.S.C. § 40128(b)(7).

20.     Thus, currently, if the number of flights over a park exceeds 50 per year,

NPATMA requires that the FAA develop an ATMP for the park as described at 49 U.S.C. §

40128(b)(1)(B), or enter into a voluntary agreement with all operators over the park as described

at 49 U.S.C. § 40128(b)(7).

21.     The NPATMA also provides for the grant of interim operating authority to

operators on an annual basis pending development of an ATMP and terminating 180 days after

the establishment of an ATMP.  49 U.S.C. § 40128.

22.     NPATMA provides that the "objective of any air tour management plan shall be

to develop acceptable and effective measures to mitigate or prevent the significant adverse

impacts, if any, of commercial air tour operations upon the natural and cultural resources, visitor

experiences, and tribal lands." 49 U.S.C. § 40128(b)(1)(B).

23.     To accomplish that goal, the FAA is allowed to ban, in whole or in part, air tour flights over the park, and "may establish conditions for the conduct of commercial air tour operations over a national park, including commercial air tour routes, maximum or minimum altitudes, time-of-day restrictions, restrictions for particular events, maximum number of flights per unit of time, intrusions on privacy on tribal lands, and mitigation of noise, visual, or other impacts[.]" 49 U.S.C. § 40128(b)(3)(A), (B).

24.     Voluntary agreements as an alternative to ATMPs "shall address the management issues necessary to protect the resources of such park and visitor use of such park" and may include provisions similar to those for ATMPs. 49 U.S.C. § 40128(b)(7)(B).  They are also subject to required public review and consultation with affected Indian Tribes. 49 U.S.C. § 40128(b)(7)(C).

25.     Plaintiffs suffer from noise and visual impacts of park overflights during their various activities in the parks.  If there were fewer aircraft and less noise, the hikers, birdwatchers, tour operators, soundscape recorders, environmental educators, and nearby residents who belong to PEER would be able to enjoy the parks and their properties more. Moreover, the Hawaiian homeowners in HICoP would have less disruption to the quiet enjoyment of their properties.  If the FAA were to develop an ATMP for each PIO, or voluntary agreements with all of the operators, then the FAA would have to consider and mitigate the impacts on Plaintiffs.  Even minor changes to altitudes, routes, number of flights per hour, and time-of-day restrictions would significantly mitigate the harm to Plaintiffs from the status quo.

26.     However, by the FAA's own account, in the 17 years since the passage of the NPATMA, it has not developed a single ATMP.  Nor has it focused its efforts on the voluntary agreement alternative, for there are currently only two operative voluntary agreements that cover

Big Cypress National Preserve and Biscayne National Park. As of 2015, there were 24 parks with more than 50 flights per year. NATIONAL PARK SERVICE, REPORTING INFORMATION FOR COMMERCIAL AIR TOUR OPERATIONS OVER NATIONAL PARK UNITS: 2015 ANNUAL REPORT (2017). In addition, the NPS withdrew the exemption for Death Valley National Park and Mount Rainier from the list for 2014 and 2015. 81 Fed. Reg. 75,183 (Oct. 28, 2016). Thus, as of 2015, 26 park units were subject to the ATMP requirement or voluntary agreement alternative.

27.    In lieu of following the statutory scheme requiring the development of ATMPs or voluntary agreements, the FAA has repeatedly granted annual interim operating authority to commercial air tour operators, far beyond the 24 months the statute allows for developing ATMPs and making decisions on the operating authority applications. 49 U.S.C. § 40128(c)(2)(A).

28.    In the case of the PIOs that are the subject of this complaint, there have been overflight operators since before the enactment of NPATMA, and the operators in those parks have been operating based on interim authority since the law was enacted in 2000. The interim authority for each of these operators has been renewed annually for the past 17 years without ever developing an ATMP or entering a voluntary agreement. In some cases, new operators in the PIOs have been granted interim operating authority. All such operators have been operating based on interim authority and without ATMPs or voluntary agreements for at least eight years.

29.    As a result, members of PEER and HICoP have been injured in the following ways, among others: loss of aesthetic enjoyment, decline in property value, damage to businesses and professional pursuits, reduced hiking enjoyment, loss of sleep, and increased stress.

30.    The FAA has deliberately ignored a statutory mandate to pursue an alternative policy that it prefers. In order to end the agency's obstructionism, the FAA must be compelled

to either develop ATMPs for the PIOs or enter into voluntary agreements with all of the commercial air tour operators for those park units.

## STATUTORY BACKGROUND

### A. National Park Air Tour Management Act

31.     The National Park Air Tour Management Act, 49 U.S.C. § 40128, was passed by Congress in response to the problems of uncontrolled low-flying aircraft conducting extended tours over national park lands.  Those problems included noise pollution, wildlife disruption, and injury to visitor experiences.

32.     NPATMA originally required an ATMP for every park where there were overflights, but the FAA Modernization Reform Act of 2012 introduced exemptions for parks with fewer than 50 flights per year and the alternative of voluntary agreements between operators and the FAA.  FAA Modernization Reform Act of 2012, Pub. L. No. 112-95, 126 Stat. 11.

33.     NPATMA requires the establishment of an ATMP by the Administrator of the FAA in cooperation with the Director of the National Park Service "for any national park or tribal land where such a plan is not in effect whenever a person applies for authority to conduct a commercial air tour operation over the park." 49 U.S.C. § 40128(b)(1)(A).

34.     Before beginning a commercial air tour operation, the air tour operator is required to apply for authority to conduct the operations over the park.  49 U.S.C. § 40128(a)(2)(A).

35.     The Administrator of the FAA "shall make every effort to act on any application under this paragraph and issue a decision on the application not later than 24 months after it is received or amended."  49 U.S.C. § 40128(a)(2)(E).

36.     Upon application for authority to conduct operations from an existing commercial air tour operator, defined as an air tour operator that has conducted commercial air tour

11

operations within the last 12 months over the park, 49 U.S.C. § 40128(g)(2), the FAA must grant

interim operating authority to the applicant.  49 U.S.C. § 40128(c)(1).  Interim operating

authority provides for the greater of either the number of flights flown within the 12 month

period preceding the enactment of the statute or the average number of flights per 12 month

period within the preceding 36 month period.  49 U.S.C. § 40128(c)(2)(A)(i),(ii).

37.     The FAA may, in cooperation with the Director of the National Park Service,

grant interim operating authority to a new entrant air operator provided the Director of the

National Park Service agrees.  49 U.S.C. § 40128(c)(3)(A)(iii).

38.     Interim operating authority expires 180 days after the establishment of an ATMP

for a park unit.  49 U.S.C. § 40128(c)(2)(E).

**B.   Administrative Procedure Act**

39.     The Administrative Procedure Act ("APA") makes final agency action subject to

judicial review, 5 U.S.C. § 704, and authorizes courts reviewing agency action to hold  unlawful and

set aside final agency action, findings and conclusions that are arbitrary and capricious, an abuse of

discretion or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

40.     The APA allows a court to compel agency action unlawfully withheld or

unreasonably delayed. 5 U.S.C. § 706(1).

**C.   National Environmental Policy Act**

41.     The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq.*, is the

"basic national charter for protection of the environment." 40 C.F.R. 1500.1. Its purposes are to

"help public officials make decisions that are based on understanding of environmental

consequences, and to take actions that protect, restore, and enhance the environment," *id.* at §

1500.1(c), and to "insure that environmental information is available to public officials and

citizens before decisions are made and before actions are taken." *Id.* at § 1500.1(b).

42.     To accomplish these purposes, NEPA provides that a Federal agency must prepare an environmental impact statement ("EIS") for "proposals for…major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1502.3. The Council on Environmental Quality regulations list a number of factors that an agency must consider in deciding whether to prepare an EIS. 40 C.F.R. § 1508.27. The agency must prepare the EIS or otherwise comply with NEPA *before* going forward with an action.  Moreover, actions subject to NEPA "include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action." 40 C.F.R. § 1508.18.

43.     The NEPA process requires the acting agency to first determine whether the action is one that normally requires an EIS. 40 C.F.R. § 1501.4(a)(1). An agency action does not normally require an EIS if it falls within a categorical exclusion. *Id.* § 1501.4(a)(2). "Categorical exclusion" is defined as "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations." 40 C.F.R. § 1508.4. If an agency determines that the action is not the kind that normally requires an EIS and does not invoke a categorical exclusion, the agency is required to prepare an environmental assessment ("EA") to determine whether an EIS is necessary. *Id.* §§ 1501.3, 1501.4(b), 1508.9. If the agency concludes, based on the EA, that an EIS is not required, it must prepare a finding of no significant impact ("FONSI") which explains the agency's reasons for its decision. *Id.* §§ 1501.4(e), 1508.13.

## CLAIMS FOR RELIEF

### Count I – Violation of the Administrative Procedure Act

44.     Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs.

45.     The APA allows a plaintiff to sue to compel agency action unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1).

46.     The failure to develop ATMPs for the PIOs or voluntary agreements in accordance with 49 U.S.C. § 40128(b) is agency action unlawfully withheld in violation of 5 U.S.C. § 706(1).

47.     The failure to develop ATMPs for the PIOs or voluntary agreements in accordance with 49 U.S.C. § 40128(b) is agency action unreasonably delayed in violation of 5 U.S.C. § 706(1).

### Count II – Violation of the National Park Air Tour Management Act

48.     Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs.

49.     The PIOs are subject to NPATMA and not exempted based on less than 50 flights per year.

50.     The commercial air tour operators in the PIOs have been operating based on interim authority, without the establishment of an ATMP or a voluntary agreement, for at least eight years, and in most cases, for the entire 17 years since the enactment of NPATMA.

51.     The grant of interim operating authority is based upon an application for authority to conduct commercial air tour operations.

52.     FAA is required to develop and implement an ATMP before granting operating authority.  49 U.S.C. §§ 40128(a)(2)(D).

53.     The NPATMA states that the Administrator of the FAA "shall make every effort to act on any application under this paragraph and issue a decision on the application not later than 24 months after it is received or amended."  49 U.S.C. § 40128(a)(2)(E).

54.     Therefore, upon the initial grant of interim operating authority to the applying operators, the FAA had 24 months to develop an ATMP or enter a voluntary agreement with each operator.

55.     The FAA has been annually reauthorizing the interim operating authority of the operators in those parks well in excess of the 24 months the FAA had to develop an ATMP or enter a voluntary agreement, which would remove the need for interim operating authority.

56.     The FAA has failed to develop an ATMP for each PIO or a voluntary agreement with each operator in each PIO within 24 months of application for operating authority, as NPATMA requires.

57.     Defendant's failure to develop the mandatory ATMPs or voluntary agreements in the PIOs is in violation of the NPATMA.  Its actions should be set aside and found unlawful.

### Count III – Violation of the National Environmental Policy Act

58.     Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs.

59.     The National Environmental Policy Act requires that agencies "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on -- (i) the environmental impact of the proposed action, (ii) any adverse

environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(C).

60.     The NPTMA requires NEPA compliance by means of an EIS or EA for ATMPs. 49 U.S.C. § 40128(b)(2).

61.     The FAA's repeated grants of interim authority for air tours without the development of ATMPs or voluntary agreements is likewise a "major Federal action " that has impacts on the environment and is subject to NEPA.

62.     The FAA's failure to act to develop ATMPs or voluntary agreements, as required by law, is also subject to NEPA.  Actions subject to NEPA "include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action." 40 C.F.R. § 1508.18.

63.     The FAA's failure to act is reviewable under the APA, because discretion to ignore the statutory mandate cannot be committed to the FAA.

64.     Commercial air tour operations conducted over parklands result in noise that can cause adverse effects on human environmental quality and wildlife and deleterious health effects. Even though one flight may be insignificant, there are hundreds or thousands of flights over the 7 PIOs, which could have serious cumulative impacts.  Moreover, the presence of air tours could potentially harm a species listed under the Endangered Species Act, 15 U.S.C. § 1531, *et seq*.

65.     The FAA has not prepared an EIS or EA concerning its grants of interim authorities or its failure to prepare ATMPs or voluntary agreements for the PIOs. Nor has FAA properly claimed a categorical exclusion from NEPA. The FAA is therefore in violation of NEPA.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request the court to order the following relief:

A.  Declare that Defendant has violated the APA, 5 U.S.C.§ 706(1), providing that agency actions must not be unreasonably delayed or unlawfully withheld, by failing to develop any ATMPs or voluntary agreements for the PIOs, which are required by law.

B.  Declare that Defendant has violated the NPATMA, 49 U.S.C. § 40128, by failing to develop any ATMPs or voluntary agreements for the PIOs, as NPATMA requires the FAA to do within 24 months of an air tour operator's application for operating authority.

C.  Declare that Defendant has violated NEPA by failing to prepare an environmental impact statement and by failing to conduct any environmental analysis of the effect of its multiple and repeated grants of interim authority and of its inaction in developing ATMPs or voluntary agreements.

D.  Order Defendant to develop an ATMP for each PIO or voluntary agreements with each operator in each PIO, as soon as possible and no later than 24 months from the Court's order.

E.  Enjoin any further air tour operations over the PIOs where ATMPs or voluntary agreements are not in place 24 months after the Court's order.

F.  Award Plaintiffs their reasonable litigation expenses, including attorneys' fees, court costs and other expenses pursuant to the Equal Access to Justice Act, 29 U.S.C. § 2412, *et seq.*

17

G.  Grant such additional relief as the Court deems just and proper.


Dated:  October 4, 2017

Respectfully submitted,

*Paula Dinerstein*

Paula Dinerstein
D.C. Bar No. 333971
Public Employees for Environmental Responsibility
962 Wayne Ave., Suite 610
Silver Spring, MD 20910
202-265-7337 (tel)
202-265-4192 (fax)
pdinerstein@peer.org